IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In Re:<br><br>AXON RIG CONCEPT & DESIGN, LLC,<br><br>Debtor. | Case No. 17-32332 (JB)<br><br>Chapter 7 |

**WELLS FARGO BANK, NATIONAL ASSOCIATION'S OBJECTION TO (I) MOTION TO COMPROMISE CONTROVERSY AND (II) MOTION TO SELL PERSONAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES**

(Relates to Dkt. Nos. 45 and 46)

Wells Fargo Bank, National Association, a secured creditor and party-in-interest in the above-captioned bankruptcy case, hereby objects to the chapter 7 trustee's (I) Motion to Compromise Controversy with Gulf Copper & Manufacturing Corporation (Dkt. No. 46) and (II) Motion to Sell Personal Property Free and Clear of All Liens, Claims, and Encumbrances (Dkt. No. 45). In support thereof, Wells Fargo Bank, National Association respectfully represents as follows:

### I. BACKGROUND

1. Axon Rig Concept & Design, LLC (f/k/a Axon Rig Concept & Design, Inc.) (the "Debtor") filed with this Court its voluntary petition for relief under chapter 7 of the United States Bankruptcy Code on April 17, 2017 (the "Petition Date"). On May 22, 2017, Rodney Tow was appointed chapter 7 trustee (the "Trustee") in this bankruptcy case, and continues to serve in that capacity.

2. As of the Petition Date, the Debtor was and still is indebted to Wells Fargo Bank, National Association ("Wells Fargo") under that certain Credit Agreement, dated as of February 14, 2012 (as amended, restated, or otherwise modified from time to time the "Credit Agreement,"

#5617035

and, together with all other documentation executed in connection therewith, the "Credit Documents") by and among, *inter alia*, the guarantors and borrowers thereunder (in each case including, but not limited to the Debtor), Wells Fargo, the issuing lender, the lenders, the swap counterparties and the banking service providers (Wells Fargo, the issuing lender, the lenders, the swap counterparties and the banking service providers together, the "Secured Parties").

3. On April 25, 2017, Wells Fargo, in its capacity as administrative agent, issuing lender, and swing line lender under the Credit Documents, filed a proof of claim (the "Claim") on behalf of the Secured Parties based on their claims against the Debtor arising under the Credit Documents. The Claim is based on prepetition amounts due and owing by the Debtor under the Credit Agreement and related Credit Documents in the total amount of $38,401,004.29 (the "Prepetition Indebtedness").[1]

4. The Prepetition Indebtedness is secured to the extent of the value of the collateral (the "Prepetition Collateral") that is described in: (i) that certain Pledge and Security Agreement dated as of February 14, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"); and (ii) that certain Guaranty Agreement dated as of February 14, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty Agreement" and together with the Security Agreement and all other related documents, the "Security Documents").

5. The Prepetition Collateral includes, among other things: (i) all equipment of the Debtor, (ii) all inventory of the Debtor, (iii) all accounts, money, payment intangibles, and deposit accounts of the Debtor, and (iv) all other property and rights of every kind and description and interests therein of the Debtor.

---

[1] A detailed account of the obligations comprising the Prepetition Indebtedness is included in the Claim, filed in the Court's claims register at Claim 1-1.

#5617035

6. Prior to the Petition Date, on October 28, 2014, a lawsuit commenced between the Debtor and Gulf Copper & Manufacturing Corporation ("Gulf Copper") in the 151st Judicial District Court of Harris County, Texas, styled *Axon Rig Concept & Design LLC v. Gulf Copper & Mfg. Corp., et al.*, Case No. 2014-63456 (the "Lawsuit"). The Lawsuit arose out of a project in which the Debtor contracted with Gulf Copper for Gulf Copper to fabricate and construct portions of an offshore drilling rig. During the course of the project, several disputes arose between the Debtor and Gulf Copper regarding (i) the parties' respective obligations under the relevant agreements executed by and amongst the Debtor and Gulf Copper and (ii) certain change orders issued by Gulf Copper to the Debtor related to Gulf Copper's work on the project. In the Lawsuit, the Debtor seeks damages from Gulf Copper in the amount of approximately $20,000,000 for breach of contract, promissory estoppel, breach of warranties, and fraud relating to the relevant contracts and change orders. Gulf Copper has asserted counterclaims against the Debtor for breach of contract, quantum meruit, fraud, and promissory estoppel in the amount of approximately $4,600,000.

7. While the Lawsuit was pending, but prior to the Petition Date, the Debtor needed to deliver the completed offshore drilling rig at issue in the Lawsuit to its customer located in China. However, Gulf Copper had previously filed a materialman's lien encumbering the rig, which required the Debtor to obtain a release from Gulf Copper prior to its shipment of the rig. Thus, in accordance with the relevant agreements between the Debtor and Gulf Copper, the Debtor, as Principal, and Aspen American Insurance Company ("Aspen"), as Surety, executed that certain Bond to Indemnify Against Disputed Contract Amounts, dated January 22, 2015 (as amended, restated, supplemented, or otherwise modified from time to time, including but not limited to, that certain Increase Rider dated February 18, 2015, the "Bond"). The purpose of the Bond was to

provide indemnification for Gulf Copper (in the event Gulf Copper succeeded on its claims against the Debtor in the Lawsuit) in place of the lien Gulf Copper had placed upon the subject rig. Accordingly, the Bond was for the amount of Gulf Copper's claims in the Lawsuit—$4,644,538.35.[2]

8. After the filing of this bankruptcy case, on April 19, 2017, the Debtor filed a suggestion of bankruptcy in the Lawsuit. Accordingly, all proceedings in the Lawsuit have been stayed during the pendency of this bankruptcy case.

9. On December 21, 2017, the Trustee filed the Motion to Compromise Controversy with Gulf Copper & Manufacturing Corporation (the "9019 Motion," filed at Dkt. No. 46), in which the Trustee and Gulf Copper propose a settlement of the claims asserted in the Lawsuit as follows:

(a) The Debtor's estate agrees to settle Gulf Copper's claims for a total of $6,058,535.00;

(b) Gulf Copper will be granted an allowed claim in the amount of $6,058,535.00. Of the $6,058,535.00 allowed claim, $4,644,538.35 is for the compromise of the claims asserted by Gulf Copper in the Lawsuit secured by the Bond;

(c) Upon approval of the 9019 Motion, the Debtor's estate and Gulf Copper shall seek entry of a final judgment in the Lawsuit;

(d) The final judgment in the Lawsuit shall be in favor of Gulf Copper and against the Debtor in the total amount of $6,058,535.00 and shall stipulate that of the $6,058,535.00 judgment, $4,644,538.35 is for the compromise of the claims asserted by Gulf Copper in the Lawsuit secured by the Bond;

(e) The Debtor's estate and Gulf Copper shall file the necessary motion to sever the claims between the Debtor and Gulf Copper in the Lawsuit once the final judgment is entered;

(f) The final judgment in the Lawsuit will dismiss the Debtor's and the Debtor's estate's claims against Gulf Copper with prejudice;

---

[2] In connection with the Bond, the Debtor's parent entity, Axon Energy Products AS ("Axon Energy"), executed that certain Parental Guarantee dated as of January 16, 2015 (the "Parental Guarantee").

(g)     The final judgment in the Lawsuit will dismiss the Debtor's and the Debtor's estate's claims against Aspen American Insurance Company and Aspen Specialty Insurance Company without prejudice;

(h)     Upon the approval of the 9019 Motion, Gulf Copper will pay the Trustee the non-refundable sum of $25,000; and

(i)      Upon Gulf Copper's receipt of payments totaling $4,500,000 (presumably from the Bond) or more in satisfaction of the final judgment or the settlement, Gulf Copper will pay an additional $225,000 to the Trustee.

10.     On the same day, apparently in connection with the 9019 Motion, the Trustee filed the Motion to Sell Personal Property Free and Clear of All Liens, Claims, and Encumbrances (the "Sale Motion," filed at Dkt. No. 45), in which the Trustee seeks approval of this Court to sell certain scrap rig substructure and modules related to the offshore drilling rig at issue in the Lawsuit. The Sale Motion proposes a sale of those assets to Gulf Copper.

## II. OBJECTION

11.     Wells Fargo hereby objects to the 9019 Motion and the Sale Motion[3] because the motions do not impart a benefit to the Debtor or the Debtor's estate. Rather, the 9019 Motion and the Sale Motion are requests to unreasonably dispose of the Secured Parties' Prepetition Collateral without a full and fair investigation of the value of such collateral.

12.     The Security Agreement grants the Secured Parties a security interest in essentially all of the Debtor's assets existing at the time of execution of the Security Agreement or thereafter acquired by the Debtor. Specifically, the Security Agreement provides:

> ***Each Grantor*** hereby pledges, hypothecates, assigns, charges, mortgages, delivers, and transfers to the Administrative Agent, for the ratable benefit of each Secured Party, and ***hereby grants to the Administrative Agent, for the ratable benefit of each Secured Party, a continuing security interest in all of such Grantor's right, title and interest in, to and under, all of the following, whether***

---

[3] Independent of the 9019 Motion, Wells Fargo has no objection to the relief sought in the Sale Motion. However, to the extent the sale contemplated by the Sale Motion is related to (or is a term of) the compromise proposed by the 9019 Motion, Wells Fargo hereby objects to the Sale Motion for the reasons set forth herein.

-5-

#5617035

*now owned or hereafter acquired* by such Grantor, and wherever located and whether now owned or hereafter existing or arising (collectively, the "Collateral"):

\*\*\*

(c) all accounts, money, payment intangibles, deposit accounts (including the Collateral Accounts and all amounts on deposit therein and all cash equivalent investments carried therein and all proceeds thereof), *contracts, contract rights, all rights constituting a right to the payment of money, chattel paper, documents, documents of title, instruments, letters of credit, letter of credit rights and General Intangibles of such Grantor*, whether or not earned by performance or arising out of or in connection with the sale or lease of goods or the rendering of services, including all moneys due or to become due in repayment of any loans or advances, and all rights of such Grantor now or hereafter existing in and to all security agreements, guaranties, leases, agreements and other contracts securing or otherwise relating to any such accounts, money, payment intangibles, deposit accounts, contracts, contract rights, rights to the payment of money, chattel paper, documents, documents of title, instruments, letters of credit, letter of credit rights and General Intangibles (any and all such accounts, money, payment intangibles, deposit accounts, contracts, contract rights, rights to the payment of money, chattel paper, documents, documents of title, instruments, letters of credit, letter of credit rights and General Intangibles being the "Receivables", and any and all such security agreements, guaranties, leases, agreements and other contracts being the "Related Contracts");

\*\*\*

(k) *all accessions, substitutions, replacements, products, offspring, rents, issues, profits, returns, income and proceeds of and from any and all of the foregoing Collateral* (including proceeds which constitute property of the types described in clauses (a), (b), (c), (d), (e), (f), (g), (h), (i) and (j) and proceeds deposited from time to time in any lock boxes of such Grantor, and, to the extent not otherwise included, all payments and proceeds under insurance (whether or not the Administrative Agent is the loss payee thereof), or any condemnation award, indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the Collateral); [and]

\*\*\*

(n) *all of such Grantor's other property and rights of every kind and description and interests therein, including without limitation*, all other "Accounts", "Certificated Securities", "Chattel Paper", "Commercial Tort Claims", "Commodity Accounts", "Commodity Contracts", "Deposit Accounts", "Documents", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter of Credit Rights", "Letters of Credit", "Money", "Payment Intangibles", "Proceeds", "Securities", "Securities Account", "Security Entitlements", "Supporting Obligations" and "Uncertificated Securities" as each such terms are defined in the UCC

#5617035

*See* the Security Agreement § 2.1 (emphasis added).  Pursuant to the explicit terms of the Security Agreement, the Debtor granted the Secured Parties a security interest in the Debtor's contract rights and all proceeds or rights of payment arising from such contract rights.  Thus, the Debtor's claims against Gulf Copper in the Lawsuit—which arise from the Debtor's contracts with Gulf Copper—are included in the Prepetition Collateral pledged to the Secured Parties pursuant to the Security Agreement.  Moreover, any proceeds received by the Debtor in satisfaction of its claims against Gulf Copper in the Lawsuit were likewise pledged to the Secured Parties pursuant to the Security Agreement.  In sum, the claims asserted by the Debtor against Gulf Copper in the Lawsuit (as well as any amount received by the Debtor or the Debtor's estate in satisfaction of those claims) are the Prepetition Collateral of the Secured Parties.

13.    Given the fact that the Debtor's claims against Gulf Copper are the Prepetition Collateral of the Secured Parties, the amount received by the Debtor or its estate in connection with the resolution of the Debtor's claims against Gulf Copper will eventually be distributed to the Secured Parties in partial satisfaction of the Secured Parties' Claim.  *See* 11 U.S.C. §§ 506, 725.  The foregoing is true regardless of whether the amount is paid pursuant to a mutual settlement agreement (as is being sought by the Trustee in the 9019 Motion) or pursuant to a judgment eventually rendered in the Lawsuit in favor of the Debtor.

14.    Moreover, the Trustee's 9019 Motion does not adequately inform the Court as to whether the proposed settlement is fair and equitable.  Quoting the case law cited by the Trustee in the 9019 Motion:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.  Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained,

#5617035

and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). Yet, the 9019 Motion does not properly inform the Court (or the Secured Parties, for that matter) of the balance of equities related to settlement versus continuation of the Lawsuit.

15. Notably, the 9019 Motion fails to provide any information with respect to the Trustee's investigation of the Debtor's claims. In fact, the Trustee merely makes the conclusory statement that "the Trustee's investigation of the Debtor's claims, including the information provided by former counsel for the Debtor, lead him to believe that it is very unlikely the Debtor could ever recover such significant damages, or anything at all from Gulf Copper." Dkt. 46, ¶ 31. Nor does the 9019 Motion even explain the basis for the settlement amount of $6,058,535.00, which amount exceeds the Bond. Given the drastic difference in potential recovery by the Secured Parties (i.e., $250,000 under the settlement agreement versus $20,000,000 claimed by the Debtor in the Lawsuit), the Trustee should be required to provide more information regarding his investigation.

16. The Trustee similarly provides the Court with conclusory information with respect to the complexity, expense, and likely duration of the Lawsuit. The Trustee states, "Litigation would entail significant expense in trial preparation and prosecution and would not guarantee success. . . . When considering the risks as compared to the potential rewards, the Compromise is by far the best decision for the estate." Dkt. 46, ¶¶ 33-34. Again, the Trustee provides no supporting information such that the Court may fairly weigh the equities between resolution of the Debtor's claims and continuation of the Lawsuit. As a result, the Trustee should be required to provide the Court with more information.

17. While the expense of litigation could be a significant burden on the Debtor's estate, that factor alone should not justify the Trustee's compromise of the Debtor's claims in the Lawsuit for a such a significantly reduced value. As outlined above, the compromise sought by the 9019 Motion significantly reduces the potential recovery for the Secured Parties on their Claim while providing no recognizable benefit to the Debtor or the Debtor's estate. Indeed, if the Trustee's only motivation for settling the Debtor's claims in the Lawsuit is to alleviate the Debtor's estate of the burden and expense of the Lawsuit, there are other options for achieving that result without drastically reducing the Secured Parties' potential recovery on their Claim. Specifically, it would be in the best interest of the Debtor (and the Secured Parties) for the Debtor to assign its claims in the Lawsuit to the Debtor's solvent parent, Axon Energy, who is a guarantor of the Bond. After such assignment, Axon Energy could determine whether to pursue (or settle) the Debtor's claims against Gulf Copper. Furthermore, the assignment of the claims to Axon Energy would alleviate the Debtor of the burden and expense of funding the continuation of the Lawsuit. Upon information and belief, Axon Energy is amenable to such an agreement.

18. In conclusion, the 9019 Motion and the Sale Motion filed by the Trustee do not seek to convey any benefit to the Debtor or the Debtor's estate. Rather, the 9019 Motion and the Sale Motion are requests to unreasonably dispose of the Secured Parties' Prepetition Collateral without a full and fair investigation of the value of such collateral. Because there are more equitable solutions for alleviating the Debtor's estate of the potential burdens of the Lawsuit, the 9019 Motion and the Sale Motion should be denied.

### III. PRAYER

WHEREFORE, Wells Fargo Bank, National Association hereby requests that the Court deny Chapter 7 Trustee Rodney Tow's (I) Motion to Compromise Controversy with Gulf Copper & Manufacturing Corporation and (II) Motion to Sell Personal Property Free and Clear of All

Liens, Claims, and Encumbrances.  Wells Fargo further requests any and all further relief to which it proves to be justly entitled.

Respectfully submitted,

**BRACEWELL LLP**

By: */s/ Jason G. Cohen*
William A. (Trey) Wood III
Texas Bar No. 21916050
Trey.Wood@bracewell.com
Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bracewell.com
Douglas F. Monkhouse
Texas Bar No. 24082499
Doug.Monkhouse@bracewell.com

711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone:  (713) 223-2300
Facsimile:   (800) 404-3970

**ATTORNEYS FOR WELLS FARGO BANK, NATIONAL ASSOCIATION**

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically on March 19, 2018 via ECF to those parties registered to receive ECF service.

*/s/ Douglas F. Monkhouse*
Douglas F. Monkhouse

#5617035